**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**STACEY DANIEL**                                                                                          **PLAINTIFF**

**v.**                                         **Case No. 4:21-cv-00269-KGB**

**ABM INDUSTRIES INCORPORATED**                                              **DEFENDANT**

**ORDER**

Before the Court is defendant ABM Industries Incorporated's ("ABM") motion to dismiss and compel arbitration (Dkt. No. 9). Plaintiff Stacey Daniel alleges that ABM retaliated against her and discriminated against her based on her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Arkansas Civil Rights Act, Ark. Code. Ann. § 16-23-101 *et seq.* ("ACRA") (Dkt. Nos. 1, ¶¶ 116-157). Ms. Daniel bases her allegations on an adverse employment outcome, wherein ABM terminated her employment following issues with a male coworker (*Id.*, ¶¶ 54-87). ABM now moves to dismiss and compel arbitration pursuant to an agreement allegedly signed by Ms. Daniel (Dkt. No. 9, ¶ 2). Ms. Daniel challenges the validity of the agreement by claiming that the essential element of mutual assent is lacking and that the agreement therefore is unenforceable (Dkt. No. 13, at 8-21). Ms. Daniel also requests that this action be stayed rather than dismissed if this Court is to find that Ms. Daniel is subject to binding arbitration (*Id.*, at 21-22). For the following reasons, the Court grants ABM's motion to compel individual arbitration, denies as moot its motion to dismiss, and stays this case. (Dkt. No. 9).

**I.    Background**

    **A.    Ms. Daniel's Claims Against ABM**

In her complaint filed in this Court, Ms. Daniel alleges that ABM violated Title VII and the ACRA when it retaliated against her and discriminated against her based on her gender (Dkt. Nos. 1, ¶¶ 116-157). These claims, and the facts Ms. Daniel alleges to support these claims, are detailed in her complaint (Dkt. No. 1).

    **B.    Ms. Daniel's Onboarding Process And Arbitration Agreement**

In support of its motion to compel arbitration, AMB presents the affidavits of Joseph Selby, Director of HR Business Functions for ABM, and Charles "Nick" Tudor, Operations Manager for ABM (Dkt. Nos. 10-1, at 1, ¶ 1; 10-2, ¶ 1). According to Mr. Tudor, ABM provided Ms. Daniel – through a third-party site, the Sterling Candidate Portal – with a set of onboarding documents for her employment with ABM (Dkt. No. 10-2, ¶ 17). Mr. Selby avers that ABM did not require Ms. Daniel to complete the above-mentioned onboarding packet on an ABM-issued device; she could fill out the forms at any convenient location (Dkt. Nos. 10, at 2; 10-1, at 8, ¶ 21). ABM provides employees with the opportunity to sign the onboarding packet using an electronic signature (Dkt. No. 10-1, at 4-6, ¶ 15). Ms. Daniel agreed to use an electronic signature to sign her onboarding documents (*Id.*, at 12, ¶ 30).

Ms. Daniel admits that she received an email from Sterling Talent Solutions, which included a temporary password and instructed her to use her email address to sign in for pre-employment screening (Dkt. No. 13-3, ¶ 33). She admits she was able to sign an authorization for background check off-site from the facility but then had difficulty completing the other forms (*Id.*, ¶¶ 36-38). She explains that she contacted Mr. Tudor, who advised her to come to the facility, and that she went to the training center, met with Mr. Tudor, and received his assistance in the

2

onboarding process (*Id.*, ¶¶ 40-50). More specifically, Ms. Daniel claims that the Sterling Candidate Portal remained unavailable and that she filled "out by hand onboarding documents including a job application, direct deposit form and tax documentation that Tudor placed in a yellow folder and placed in his office." (*Id.*, ¶ 47). Clearly, Ms. Daniel acknowledges that she did not fill out by hand all of the forms at issue because she explains "Tudor told me if we could not get Sterling to work, that I could fill out my forms on paper and email or fax them to complete the onboarding process." (*Id.*, ¶ 49). She also maintains that "[a]fter filling out the hard copy paperwork on April 2, 2019, I did not complete anymore paperwork electronically with regards to my onboarding documents." (*Id.*, ¶ 50).

Ms. Daniel presents the Court with an affidavit asserting that she did not sign the Mutual Arbitration Agreement ("Agreement") or Mutual Arbitration Agreement Employee Acknowledgement ("Acknowledgment") (Dkt. No. 13-3, ¶ 53-62). Ms. Daniel's electronic signature is on numerous documents in the record before the Court (Dkt. No. 10-1, at 55-89).

Mr. Tudor denies ever onboarding a candidate who declined to use his or her electronic signature and has no paper copies of signed hiring documents from an employee during his time with ABM (Dkt. No. 10-2, ¶ 10). Mr. Tudor denies ever accessing a candidate's hiring documents and attempting to sign on behalf of a candidate or directing anyone other than the candidate him or herself to access the Sterling Candidate Portal to review and sign the hiring documents (*Id.*, ¶ 14).

One of the documents included in the onboarding packet was the Agreement and its corresponding Acknowledgement (Dkt. Nos. 10, at 2; 10-1, at 15-19). The Agreement requires Ms. Daniel and ABM to arbitrate any and all disputes arising from Ms. Daniel's employment or

application for employment with ABM; the Agreement has limited exceptions (Dkt. No. 10, at 2; 10-1, at 15-19). Specifically, the Agreement provides that the parties will arbitrate:

> any claim (except a claim that by law is non-arbitrable) that arises between me and the Company, its past, present, and future: parent(s), subsidiaries, affiliates, and/or their respective past, present, and future: officers, directors and/or employees, including but not limited to claims arising and/or relating in any way to my hiring, my employment with, and/or the severance of my employment with, the Company. This agreement applies to successor entities without the need for a formal assignment by the Company. This agreement includes any Covered Claim brought against a third-party, including but not limited to any client(s) and/or vendor(s) of the Company, and this provision can be enforced by any such third- party through a motion to compel arbitration, to the extent necessary. Covered Claims include, but are not limited to, any claim for breach of contract, for any provision of state labor code or a Wage Order, for unpaid fees, expenses, wages, or overtime, for unpaid compensation or penalties for missed meal or rest breaks, for wrongful termination, for unfair competition, ***for discrimination, harassment, or unlawful retaliation***, for violation of the Fair Labor Standards Act, and for violation of the California Labor Code Private Attorneys General Act of 2004 (the "PAGA") ***or any applicable similar laws, to the full extent permitted by applicable law***

(Dkt. No. 10-1, at 15) (emphasis added). ABM has presented the declaration of Joseph Selby, who swears to the authenticity of the Acknowledgment signed by Ms. Daniel (Dkt. No. 10-1, at 9-12, ¶¶ 25-33). ABM has also presented copies of the Agreement and the Acknowledgment (*Id.*, at 14-19). The Agreement is executed by a representative from ABM, and it appears to have spaces for an employee's initials and physical signature. There is evidence before the Court that, at ABM, a format requiring initials on each page and a wet signature at the end is no longer used in the onboard process for ABM, although the content of the Agreement remains the same (Dkt. Nos. 10-1, at 2, ¶ 7; 10-2, ¶ 13).

Ms. Daniel electronically signed the Acknowledgment on April 2, 2019, acknowledging that she had received the Agreement, read it, understood it, and agreed to it (Dkt. No. 10-1, at 19). Furthermore, the following appeared at the bottom of the Agreement and is the entire text of the Acknowledgement signed by Ms. Daniel on April 2, 2019:

> **BY SIGNING THIS AGREEMENT, I KNOWINGLY AND VOLUNTARILY WAIVE FOR ANY COVERED CLAIM THE RIGHT TO CLASS, REPRESENTATIVE, AND COLLECTIVE PROCEDURES AND THE RIGHT TO TRIAL BY JURY OR JUDGE, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW. I RETAIN ALL OTHER RIGHTS, INCLUDING MY RIGHT TO COUNSEL, TO CALL AND CROSS-EXAMINE WITNESSES, AND TO HAVE MY CLAIMS ADDRESSED BY AN IMPARTIAL FACT FINDER. I ACKNOWLEDGE THAT I AM HEREBY ADVISED TO SEEK LEGAL ADVICE AS TO MY RIGHTS AND RESPONSIBILITIES UNDER THIS AGREEMENT AND HAVE AVAILED MYSELF OF THE ADVICE OF COUNSEL TO THE EXTENT I WISH TO DO SO.**
>
> **I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, AND THAT I UNDERSTAND ITS TERMS.**

(Dkt. No. 10-1, at 15-19).

## II.    Legal Standard

The Federal Arbitration Act provides that certain arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts must therefore "rigorously enforce arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (internal quotation omitted). "[T]he first task of a court asked to compel arbitration . . . is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). "Arbitration is a matter of contract law, and favored status notwithstanding, parties cannot be compelled to arbitrate unless they have contractually agreed to be bound by arbitration." *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

The Court must first determine whether there is a valid arbitration agreement and then determine whether the claims fall within the terms of the arbitration agreement. *Robinson v. EOR-ARK, LLC*, 841 F.3d 781, 783-84 (8th Cir. 2016). "Whether a particular arbitration provision may

5

be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability." *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) (citing *Howsam*, 537 U.S. at 84-85).  Threshold questions of arbitrability are for a court to decide, unless there is clear and unmistakable evidence the parties intended to commit questions of arbitrability to an arbitrator.  *Id.* at 1100 (citing *Howsam*, 537 U.S. at 83).  However, even where the parties incorporate "a clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court," *Fallo v High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009), such as by incorporating the American Arbitration Association ("AAA") Employment Arbitration Rules and Mediation Procedures (together "AAA Rules") into their agreement, the Eighth Circuit Court of Appeals has explained that determining whether an arbitration agreement itself is valid is a threshold matter for the court, *Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 740-41 n.2 (8th Cir. 2014).  *See also Schwalm v. TCF Nat'l Bank*, 226 F. Supp. 3d 937, 940 (D.S.D. 2016) (stating that "[w]hether or not parties entered into an arbitration agreement falls to judicial determination" (citing *Neb. Mach. Co.*, 762 F.3d at 741-42)).

      The Court acknowledges that the Agreement incorporates the AAA Rules.  The Court could locate no Eighth Circuit case directly on point regarding whether an allegation of forgery that one party claims invalidates the arbitration agreement in its entirety is a matter of arbitrability to be decided by the arbitrator.  However, Supreme Court and Eighth Circuit precedent suggests that this question belongs to the Court as the allegation of forgery goes to the issue of whether the parties actually agreed to arbitration.  *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019) (finding courts the appropriate arbiters when "a party specifically challenges the validity of the agreement to arbitrate"); *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a

6

valid arbitration agreement exists."); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010) ("If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement. . . ."); *Northport Health Servs. of Arkansas, LLC v. Posey*, 930 F.3d 1027, 1031 (8th Cir. 2019) (reversing the district court's order compelling arbitration because the defendant "lacked the capacity to sign the contract" which created the underlying arbitration agreement); *Express Scripts, Inc. v. Aegon Direct Mktg. Servs.*, 516 F.3d 695, 701 (8th Cir. 2008) ("A dispute like the one here—over whether the parties agreed to arbitrate—will be resolved by the district court unless the parties clearly and unmistakably provide otherwise.") (internal quotations omitted); *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998), *cert denied*, 525 U.S. 1068 (1999) ("Express and Barker assert claims that go to the making of the arbitration agreement itself. Under *Prima Paint*, a court must decide whether the agreement to arbitrate is valid."); *I.S. Joseph Co., Inc. v. Mich. Sugar Co.*, 803 F.2d 396, 399-400 (8th Cir. 1986) ("If there is in fact a dispute as to whether an agreement to arbitrate exists, then that issue must first be determined by the court as a prerequisite to the arbitrator's taking jurisdiction. . . . Case law supports our holding that the enforceability of an arbitration clause is a question for the court when one party denies the existence of a contract with the other."); *N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 722, 729 (8th Cir. 1976) (describing the question of whether a party had the authority to enter an arbitration agreement on the defendant's behalf as "a question for decision by the courts, because it goes expressly to the making of the agreement to arbitrate"). Indeed, at least one district court in Arkansas has taken this exact approach. *See Carter v. Affiliated Comput. Sys., Inc.*, No. 6:10-cv-06074, 2010 WL 5572078 (W.D. Ark. Dec. 15, 2010), *report and recommendation adopted sub nom. Carter v. Affiliated Comput. Servs.*, No. 10-6074, 2011 WL 96494 (W.D. Ark. Jan. 11, 2011).

The motion to compel arbitration is reviewed under a standard akin to the summary judgment standard. *See Neb. Mach. Co.*, 762 F.3d at 741-42. However, if a material fact dispute is raised that concerns the "making of the arbitration agreement . . . the court shall proceed summarily to trial thereof," and the court resolves the fact issue when no jury trial is requested. *Neb. Mach. Co.*, 762 F.3d at 743 (quoting 9 U.S.C. § 4); *see also Burnip v. Credit Acceptance Corp.*, No. 0:18-CV-01839-JRT-KMM, 2019 WL 2029555, at *4 (D. Minn. Jan. 15, 2019), *report and recommendation adopted*, No. CV 18-1839 (JRT/KMM), 2019 WL 1110801 (D. Minn. Mar. 11, 2019).

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III. Discussion Regarding Creation Of Agreement

ABM argues that all of Ms. Daniel's claims are subject to arbitration, as Ms. Daniel signed the Acknowledgment form (Dkt. No. 10, at 3-4).  Ms. Daniel disputes that she is bound to arbitrate her claims with ABM for several reasons:  (1) she claims that she did not enter into a valid arbitration agreement with ABM, as the Agreement and the Acknowledgment are two separate documents, (2) she never signed the Agreement because she gave her password to a supervisor to complete the onboarding paperwork, and (3) the onboarding process was such that Ms. Daniel could not assent to the contract to arbitrate (Dkt. Nos. 13, at 8-21; 13-3, ¶ 54-63).

#### A. The Agreement And The Acknowledgment

Ms. Daniel claims that ABM cannot produce a signed arbitration agreement, arguing that ABM's inability to produce a signed writing precludes ABM's ability to successfully win its motion to compel arbitration (Dkt. No. 13, 10-11).  Ms. Daniel dismisses ABM's production of the signed Acknowledgment because the Acknowledgment "is one paragraph long and omits several key provisions of the arbitration agreement" (*Id.*, at 11).  Ms. Daniel argues that "[t]his failure to provide the full Agreement alone is enough to establish no contract was entered" (*Id.*).

The Acknowledgment, which is a separate form from the Agreement restates the final two paragraphs of the Agreement (Dkt. No. 10-1, at 19).  Specifically, the Acknowledgment provides:

> **BY SIGNING THIS AGREEMENT, I KNOWINGLY AND VOLUNTARILY WAIVE FOR ANY COVERED CLAIM THE RIGHT TO CLASS, REPRESENTATIVE, AND COLLECTIVE PROCEDURES AND THE RIGHT TO TRIAL BY JURY OR JUDGE, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW. I RETAIN ALL OTHER RIGHTS, INCLUDING MY RIGHT TO COUNSEL, TO CALL AND CROSS-EXAMINE WITNESSES, AND TO HAVE MY CLAIMS ADDRESSED BY AN IMPARTIAL FACT FINDER. I ACKNOWLEDGE THAT I AM HEREBY ADVISED TO SEEK LEGAL ADVICE AS TO MY RIGHTS AND RESPONSIBILITIES UNDER THIS AGREEMENT AND HAVE AVAILED MYSELF OF THE ADVICE OF COUNSEL TO THE EXTENT I WISH TO DO SO.**

**I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, AND THAT I UNDERSTAND ITS TERMS.**

(*Id.*). The Acknowledgment bears Ms. Daniel's electronically adopted signature (*Id.*).

Whether an arbitration agreement is valid is a matter of state contract law. *E.E.O.C. v. Woodmen of World Life Ins. Soc.*, 479 F.3d 561, 565 (8th Cir. 2007); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). As Arkansas is the forum state (Dkt. No. 1, ¶ 11), the Court applies Arkansas contract law to determine the issue of validity of the Agreement. "Arkansas lists five contractual elements for a valid arbitration agreement: '(1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations.'" *Northport Health Servs. of Ark, LLC v. Posey*, 930 F.3d 1027, 103 (8th Cir. 2019) (quoting *Tyson Foods, Inc. v. Archer*, 147 S.W.3d 681, 684 (Ark. 2004)). With regard to mutuality of agreement, the Arkansas Supreme Court has consistently applied two legal principles: (1) if there is no meeting of the minds, there is no contract; and (2) in order to make a contract there must be a meeting of the minds as to all terms, using objective indicators. *Williamson v. Sanofi Winthrop Pharm. Inc.*, 60 S.W.3d 428, 434 (Ark. 2001). While the standard for determining mutuality is an objective one, "[a] party's manifestation of assent to a contract may be made wholly by spoken words or by conduct." *Childs v. Adams*, 909 S.W.2d 641, 645 (Ark. 1995) (citing *ERC Mortg. Grp., Inc. v. Luper*, 795 S.W.2d 362 (1990)).

In the instant case, the objective indicators this Court examines are the Agreement signed by an ABM representative and the Acknowledgement, titled "Mutual Arbitration Agreement," signed by Ms. Daniel (Dkt. No. 10-1, at 17, 19). *See Pine Hills Health & Rehab., LLC v. Matthews*,

431 S.W.3d 910, 915 (Ark. 2014). The Acknowledgement repeats the final two paragraphs of the Agreement (*Id.*). Ms. Daniel attempts to create a distinction between the Agreement and the Acknowledgment, when both documents, taken together, demonstrate the parties' mutual desire to enter into an enforceable contract to arbitrate certain claims.

The fact that the Agreement and Acknowledgment are considered by Ms. Daniel to be two separate documents does not change the fact that these two documents, taken together, form an enforceable contract. *See Northport Health Servs. of Arkansas, LLC v. Cmty. First Tr. Co.*, No. 2:12-CV-02284, 2014 WL 217893, at *6 (W.D. Ark. Jan. 21, 2014) (determining that a separate acknowledgment form was sufficient to demonstrate a party's assent to arbitrate); *Tharpe v. Securitas Sec. Servs.* USA, Inc., No. CV2013267KMESK, 2021 WL 717362, at *3 (D.N.J. Feb. 24, 2021) (holding that an agreement to arbitrate can "be accomplished by an acknowledgement form that is separate from the underlying agreement . . . ." provided the "form refers specifically to arbitration in a manner indicating an employee's assent"); *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1213 (8th Cir. 2012) (restating the Arkansas rule that "multiple documents executed as part of a single transaction generally will be construed together as a single contract."). *See generally Pine Hills*, 431 S.W.3d at 915.

The Court rejects this argument made by Ms. Daniel.

### B. Forgery

In addition to arguing the invalidity of the Acknowledgment, Ms. Daniel also claims that she never signed the Acknowledgment, accusing some ABM official of using her password to sign electronically the Acknowledgment and her other onboarding paperwork (Dkt. No. 13-3, ¶ 63). Ms. Daniel supports this allegation by declaring that she provided Mr. Tudor with her password

11

because there were issues with the electronic onboarding platform – Sterling Candidate Portal (*Id.*, ¶¶ 45-47).

Mr. Tudor disagrees and states that he has never "accessed a candidate's hiring documents and attempted to sign on behalf of a candidate." (Dkt. No. 10-2, ¶ 14).  Mr. Tudor also states that he has "never directed anyone, other than the candidate his or herself, to access his or her Sterling Candidate Portal to review and sign the hiring documents . . . .  [Mr.] Tudor also claims that he has never known of any individual accessing a candidate's Sterling Candidate Portal to electronically sign another's hiring documents . . . . [as] [a]ny such unauthorized access would be a violation of ABM's policies" (*Id.*).

Arkansas law recognizes the validity and legal effect of electronic signatures as follows:

> (a) A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.  (b) A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation.  (c) If a law requires a record to be in writing, an electronic record satisfies the law.  (d) If a law requires a signature, an electronic signature satisfies the law.

Ark. Code Ann. § 25-32-107.  Arkansas defines an "electronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record."  Ark. Code Ann. § 25-32-102(8).  Other courts have held that an individual who "clicked a box indicating that [they] read and acknowledged the agreement" has provided a valid signature for contract purposes under Arkansas law.  *Johnson v. Pizza Hut*, No. 1:16-cv-1089, 2017 WL 1064666, at *2 (W.D. Ark. Mar. 21, 2017).  Under Arkansas law, the party asserting forgery of a signature carries the burden of proof to establish the falsity of the signature.  *See Fuller v. Norwood*, 592 S.W.2d 452, 454 (Ct. App. Ark. 1979) (citing *Kennedy v. Couillard*, 372 S.W.2d 825 (Ark. 1963)).

The Court concludes that Ms. Daniel's assertions that her signature was forged fail to create a disputed genuine issue of material fact as to the validity of the Agreement bearing her signature. The record evidence, even with all reasonable inferences construed in favor of Ms. Daniel, shows that Ms. Daniel's forgery argument cannot survive summary judgment.

The record evidence indicates that Ms. Daniel consented to the use of an electronic signature and then subsequently used that signature to sign the following, as well as other forms: a consumer confidentiality document; direct deposit authorization form; drug free workplace policy agreement; post-offer invitation to self-identify race, gender, and veteran status; authorization for background check; emergency contact information; service worker employee handbook policy; employee instructions information, and work rules; Form W-4 (2019); voluntary self-identification of disability; employment eligibility verification; health care exchange notices; mutual arbitration agreement;[1] pay method selection; policy against harassment in the workplace; acknowledgement regarding prior employer information; employee's withholding exemption certificate; and wage policy (Dkt. No. 10, at 11; 10-1, at 58-63, 74-78, 80, 82-87, 89).

Her electronic signature is affixed to numerous documents of legal significance like her I-9 and W-4 forms (Dkt. No. 10-1, at 77, 80).  Several of the documents were electronically signed under penalty of perjury.  Moreover, many of the documents with electronic signature include personal information that only Ms. Daniel could provide such as her husband's name and phone number; her bank account number; her driver's license number; and emergency contact names and numbers (*Id.*, at 44, 59).  Her I-9 includes two other last names she had previously used to which no one at ABM would have had access on the record before the Court (*Id.*, at 80).  Ms. Daniel

---

[1] The Mutual Arbitration Agreement form is referred to as the Acknowledgment throughout this Order (Dkt. No. 10-1, at 19).

wholly fails to account for how this personal information only known to Ms. Daniel appeared on forged documents, when by her own affidavit she admits not completing by hand all forms, including many of the forms with this personal information.

The only evidence offered to show that Ms. Daniel's signature was forged is the affidavit of Ms. Daniel and the affidavit of Jody Crutcher whose sworn statement contains no first-hand representations about Ms. Daniel's onboarding (Dkt. Nos. 13-2; 13-3). Given that Ms. Crutcher presents no firsthand knowledge of Ms. Daniel's onboarding, her declaration does not, in this Court's view, create a disputed issue of material fact or alter this Court's analysis.

In her affidavit, Ms. Daniel states that she did not sign and had never seen the Agreement until after the commencement of this lawsuit (Dkt. No. 13-3, ¶¶ 53-57). Ms. Daniel claims the only document she ever signed electronically was ABM's Authorization for a background check (*Id.*, ¶ 52).

This case is similar to *Curtis v. Contractor Management Services, LLC*, No. 1:15-cv-487-NT, 2018 WL 6071999 (D. Me. Nov. 20, 2018). There, as relevant, the two plaintiffs asserted overtime claims against defendant 3PL, and 3PL moved to compel arbitration on the grounds that the plaintiffs "accessed, reviewed, and signed" the arbitration agreement using an "online platform." 2018 WL 6071999, at *2. The plaintiffs averred that they did "not recall" signing the arbitration agreement and implied "that the signatures on the 3PL Agreement are electronic forgeries." *Id.*, at *4. 3PL responded by providing the declaration of an employee who managed the online platform through which the arbitration agreement was allegedly signed. *Id.*, at *5. That employee averred that a user must first register for the platform by submitting a name, date of birth, and social security number, and then the user must create a "unique electronic signature" by answering "three of four security questions related to her personal history." *Id.* The employee

14

asserted, and the record evidence provided corroborated, that the plaintiffs completed the "identity verification process, created a unique electronic signature, and later reviewed and electronically signed the 3PL Agreement." *Id*. The district court applying New York law to assess the formation of a contract found that "[t]his evidence overcomes the Plaintiffs' unsupported implication that 3PL forged the Plaintiffs' signatures." *Id*.

In the Court's view, no reasonable factfinder could conclude that ABM, or any other entity or individual, forged Ms. Daniel's signature on the Acknowledgment. Ms. Daniel's claims about the onboarding process do not add up, given the number of documents completed with her electronic signature, the date and time those documents were completed, the manner in which those documents were completed, and the personal information included on those documents uniquely known to Ms. Daniel.

Mr. Selby avers that each candidate for a position at AMB is sent an "instructional email" with a "username and temporary password" that provides the candidate access to the Sterling Candidate Portal (Dkt. No. 10-1, at 4, ¶ 13). Mr. Selby notes that the "only way for anyone at ABM to have access to a candidate's portal is if the candidate directly shares his or her password with another AMB employee" (*Id.*). A candidate then must consent to the use of an electronic signature, as the undisputed facts indicate Ms. Daniel did (*Id.*, at 4-6, 9, ¶¶ 15, 25). Upon agreeing to use an electronic signature, the candidate receives another email to start the background check process (*Id.*, at 6, ¶ 16). Candidates must then sign a series of onboarding documents including the Acknowledgment, after being prompted to "click and acknowledge" that they agree to "electronically sign each respective document after reviewing their contents." (*Id.*, at 7, 12, ¶¶ 19, 31). The record evidence indicates that Ms. Daniel signed those onboarding documents (*Id.*, at 12, ¶ 31). Moreover, the "Log Entries," the internal database that shows when candidates access the

Sterling Candidate Portal, show that Ms. Daniel accessed the Sterling Candidate Portal on April 2, 2019, and filled out the Acknowledgment (*Id.*, at 10, 83). Further, Mr. Selby explains that the Sterling Candidate Portal "guides that individual through a series of screens which present and/or request information from him or her. Each screen informs the candidate that he or she must acknowledge certain statements pertaining to the information presented and the company policies to which that information refers before advancing to the next policy and/or acknowledgment." (Dkt. No. 10-1, at 6-7, ¶¶ 18-19).

"There is no question that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) (internal quotation omitted). "However, a properly supported motion for summary judgment is not defeated by self-serving affidavits." *Id.* (citing *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005)). The undisputed record evidence shows that Ms. Daniel went through the onboarding process described by Mr. Selby (*Id.*, at 12, ¶ 31). Ms. Daniel created a candidate profile within the Sterling Candidate Portal on April 1, 2019 (*Id.*, at 9, ¶ 26). The Log Entries show that Ms. Daniel subsequently consented to sign electronically her onboarding documents and consented to a background check later that day (*Id.*).

The Log Entries indicate that Ms. Daniel logged back into the Sterling Candidate Portal on April 2, 2019, and signed the remaining onboarding documents, including the Acknowledgment (*Id.*, at 53-54). It is Ms. Daniel's burden to establish the falsity of the signature under Arkansas law. *Fuller*, 592 S.W.2d at 454. The Court has considered all record evidence before the Court at this stage in making its determination. Even with all reasonable inferences from that record evidence drawn in her favor, the Court concludes that Ms. Daniel's unsupported assertion that

ABM forged her signature on the Acknowledgment does not suffice to call into question the authenticity of her signature under Arkansas law. *See generally id.*

### C. Mutual Assent And The Onboarding Process

Ms. Daniel's third argument for why she should not be bound by the Agreement centers around the online onboarding process, which she argues fails to demonstrate mutual assent (Dkt. No. 13, at 16). Ms. Daniel's third argument repeats many of the same claims addressed above, namely that the Acknowledgement cannot bind her because it is a separate form from the Agreement and that she never electronically signed the Agreement (*Id.*, at 18). For the reasons stated above, the Court concludes that these arguments are unpersuasive and do not invalidate the Agreement.

The remaining aspect of Ms. Daniel's argument is that her case is substantially different than a similar case decided by this Court in 2019. *See Holley v. Bitesquad.com LLC,* 416 F. Supp. 3d 809 (E.D. Ark. 2019). Specifically, Ms. Daniel argues that there can be no mutual assent because she, unlike the plaintiff in *Bitesquad*, received multiple onboarding emails, was requested rather than required to review the text of the Agreement, and was not required to type her name into any field within the Agreement (*Id.*, at 17-18).

Ms. Daniel likens herself to the plaintiff in *Shockley v. PrimeLending*, 929 F.3d 1012 (8th Cir. 2019), a case where the Eighth Circuit held that plaintiff Jennifer Shockley was not bound by an arbitration agreement because there was no proof that she accepted the terms of that agreement. 929 F.3d at 1019-20. There, the arbitration language at issue was contained in an employee handbook, and Ms. Shockley was offered two opportunities to review the handbook, though neither review was "conditioned on her offer of employment." *Id.* at 1019. Ms. Shockley

17

acknowledged the existence of the relevant arbitration provisions, but there was no proof that she actually accepted those provisions so as to form a binding contract under Missouri law. *Id.*

Here, however, this Court applies Arkansas law, which allows "multiple documents executed as part of a single transaction . . . ." to serve as one single contract. *Arrington Oil*, 664 F.3d at 1213. Furthermore, Ms. Daniel was required to affix electronically her signature to the Acknowledgement in order to be hired by ABM (Dkt. Nos. 10, at 8; 10-1, at 6, ¶¶ 17-18). Additionally, the record evidence indicates that Ms. Daniel did sign the Acknowledgment which restated the final two paragraphs of the Agreement (Dkt. No. 10-1, at 83). Lastly, the language of the Agreement makes clear that it is an agreement between the parties, entered into voluntarily, and binding as to its terms (*Id.*, at 15-17).

The undisputed record evidence shows that Ms. Daniel went through the onboarding process described by Mr. Selby (Dkt. No. 10-1., at 12, ¶ 31). Ms. Daniel created a candidate profile within the Sterling Candidate Portal on April 1, 2019 (*Id.*, at 9, ¶ 26). The Log Entries indicate that Ms. Daniel consented to sign electronically her onboarding documents, consented to a background check later that day, and signed the remaining onboarding documents, including the Acknowledgment (*Id.*, at 53-54).

As discussed above, a properly supported motion for summary judgment cannot be defeated by self-serving affidavits. *Conolly*, 457 F.3d at 876 (citing *Davidson & Assocs.*, 422 F.3d at 638). Ms. Daniel's bare allegation is not enough to create a genuine disputed issue of material fact as to whether she affixed her electronic signature to the Agreement. *Id.* The documents attached to Mr. Selby's affidavit indicate that Ms. Daniel affixed her signature to her onboarding documents which included the Acknowledgment (*Id.*, 58-63, 74-78, 80, 82-87, 89). The Log Entries indicate the same (*Id.*, at 53-54). Accordingly, the Court concludes that Ms. Daniel has

failed to create a disputed genuine issue of material fact as to the validity of the Agreement. Based upon the record evidence, the Court concludes that the Agreement is enforceable as to Ms. Daniel and that there is no genuine issue of material fact as to the parties' intent to arbitrate certain claims.

### IV. Discussion Regarding The Scope Of The Agreement

ABM argues that the Agreement, which incorporates the AAA's Rules, covers all the claims brought by Ms. Daniel (Dkt. No. 10, at 3-4). The Eighth Circuit Court of Appeals has held the incorporation of the AAA Rules into a contract requiring arbitration to be a clear and unmistakable indication that the parties intended for the arbitrator to decide threshold questions of arbitrability. *See Green v. SuperShuttle Int'l, Inc.,* 653 F.3d 766, 769 (8th Cir. 2011) (noting the AAA Rules empower the arbitrator to determine his or her own jurisdiction over a controversy between the parties). Ms. Daniel's Agreement states that "[a]bitration will be conducted pursuant to the AAA Rules, except as expressly set forth herein or where such rules are not in compliance with applicable state or federal law" (Dkt. No. 10-1, at 15). Thus, it is for the arbitrator, not this Court, to determine if the Agreement covers the claims brought by Ms. Daniel. *Id.*

For the reasons explained, taking the record evidence in the light most favorable to Ms. Daniel, the Court concludes that no reasonable juror could conclude that Ms. Daniel is not bound to the Agreement. As the Agreement incorporates the AAA Rules, the Court concludes that the arbitrator must determine his or her own jurisdiction over the controversy between Ms. Daniel and ABM. Accordingly, the Court stays Ms. Daniel's claims and refers those claims to an arbitrator for the arbitrator to determine whether those claims are arbitrable.

## V. Conclusion

For the foregoing reasons, the Court grants ABM's motion to compel individual arbitration, denies as moot its motion to dismiss, and stays this case (Dkt. No. 9).

It is so ordered this 31st day of March, 2022.

_____
Kristine G. Baker
United States District Judge